Opinion by
 

 Montgomery, J.,
 

 This appeal by the mother of a five year old girl, Carolyn Sue Lovell, is from an order dismissing her petition for a writ of habeas corpus and awarding custody of the child to its paternal grandfather George Shaw, and his wife (not the natural grandmother). It raises the frequent issue of whether the welfare of a child of tender years is better served by awarding custody to its natural mother or to someone else.
 

 The paramount consideration is the child’s welfare; and all other considerations, including parents’ rights, are subordinate to a child’s physical, intellectual, moral, spiritual and emotional well-being.
 
 Commonwealth ex rel. Wagner v. Wagner,
 
 193 Pa. Superior Ct. 40, 163 A. 2d 708. Appellant does not question that the Shaws are fine people and are able to provide an excellent home for the child, which they have been doing from the time the child was ten months old, when
 
 *341
 
 they received custody from her father. However, the .appellant contends that she, also, can provide the child with a suitable home and, therefore, her right as the mother should prevail.
 

 Appellant was married at Beaumont, Texas, on August 24, 1957, at the age of seventeen, to Arthur D. Lovell (son of George Shaw and Clara V. Shaw) then aged eighteen, while he was in the United States Navy. Arthur had adopted the name of Lovell after his mother had married Robert D. Lovell following her divorce from George Shaw. The child, Carolyn Sue, was born April 2, 1958.
 

 Judge McKenna of the court below stated in his opinion, inter alia, the following findings of fact relating to the history of Carolyn and her parents: “Shortly after the birth of the child, Arthur was courtmartialed . . . and sentenced to six months in a Government prison. . . . Rose then joined her parents in Melbourne, Florida, taking Carolyn Sue with her. Arthur served his term and on his release wrote to his wife asking her to join him in California. Complying with his request, Rose, with Carolyn Sue, travelled to Escondido, California, arriving there on February 15, 1959.
 

 “Escondido is the home of Robert D. and Clara V. Lovell. . . . Rose and Carolyn Sue stayed for a short period at the home of Mr. and Mrs. Lovell at 1047 Gamble Lane in Escondido.
 

 “Just a few days after her arrival in California, or about the 18th of February 1959, Rose was served with a summons in divorce which had been instituted by her husband. She engaged counsel and conferred with her husband and his attorney. As a result of this she was awarded custody of the child and $25.00 per week, or fifty per cent of her husband’s salary, whichever should be greater. The divorce suit was discontinued.
 

 “After the settlement and notwithstanding the award of the child to the mother, Arthur D. took the
 
 *342
 
 baby to Mexico. Rose did not see her child between that time, the latter part of 1959, and August of 1962 when she came to Pittsburgh for the purpose of recovering the baby. After the departure of Arthur and Carolyn Sue from Escondido, Rose moved to Houston, Texas. This was about Christmas time of 1959. Thereafter she maintained herself by working as a waitress, as a nurses’ aid in a Children’s Hospital and as an assistant to a photographer.
 

 “On February 9, 1962 Rose secured a divorce from her husband in Jefferson County, Beaumont, Texas. She was awarded custody of the child and her husband was directed to pay her $60.00 per month for the support of the child. Mrs. Lovell went to California in May of 1962 and located her husband in San Diego. She had him arrested and the court directed him to produce the child. On his failure to do so he was placed in jail and remained there for a short period. Thereafter Rose returned to Beaumont and remained there until she came to Pittsburgh in August of 1962. On her arrival in Pittsburgh she went to the office of her attorney. She had, according to her own testimony, shortly before this time discovered that Carolyn Sue was living with George and Betty Shaw in Mc-Keesport. At a conference attended by the Shaws and Rose, together with their counsel, it was determined that Rose should reside in McKeesport for a short period of time in order that she and the baby could become acquainted. It was understood that after this Rose should take the baby with her to her home in Texas.
 

 “Mr. and Mrs. Shaw engaged a detective to travel to Beaumont to ascertain the conditions under which the child would live in that city. During Rose’s stay in McKeesport and partially as a result of the report of the investigator they changed their minds regarding custody of the child and determined that they
 
 *343
 
 would not voluntarily relinquish Carolyn Sue to her mother.
 

 “Carolyn Sue did not take to her mother and when she was informed of the possibility of her journey to Texas she became quite disturbed.”
 

 Under the foregoing findings it is reasonable to conclude that the father of this child was irresponsible and determined to deprive appellant of the custody of her child and succeeded in doing so despite the decrees of two courts, one in California and the other in Texas, both of which awarded custody to appellant.
 

 However, recognizing that it was not bound by either of the two decrees just mentioned, the lower court entertained jurisdiction to determine the present best interests of the child on the authority of
 
 Irizarry Appeal,
 
 195 Pa. Superior Ct. 104, 169 A. 2d 307. In denying appellant custody and awarding it to the appellees, the lower court relied on the following additional facts: “Rose J. Lovell . . . has been living in Beaumont for several years. She occupies a garage apartment in that place. She gave birth to an illegitimate child on January 12, 1960 and at first asserted that this was fathered by her husband, but she later admitted that this was not the case. Her record of employment in Beaumont is not good. She is keeping company with and is
 
 apparently
 
 on intimate terms with one Damon Davis, a married man. Mr. Davis assisted Rose financially in her travels. Rose testified that she did expect to marry Davis as soon as he secures a divorce from his wife. . . . [the child] prefers to remain with the Shaws.” (Emphasis supplied)
 

 Although appellate courts recognize the superior opportunity of a trial tribunal to pass on the credibility of witnesses and also to evaluate the fitness of contenders for custody appearing before it,
 
 Commonwealth ex rel. Wagner v. Wagner,
 
 supra, this does not rule out the right and duty of the former to review the
 
 *344
 
 record in such cases and to arrive at their own conclusions after having done so. We have reviewed the record and fail to arrive at the same conclusion reached by the lower court.
 

 Numerous rules have been established as guides to enable courts to dispose of disputes relating to the custody of children, which are always distressing. The opinion in
 
 Commonwealth ex rel. Logue v. Logue,
 
 194 Pa. Superior Ct. 210, 166 A. 2d 60, mentions some of them which are presently applicable, viz.: (1) Unless compelling reasons appear to the contrary, a child of tender years should be committed to the care and custody of its mother, by whom the needs of the child are ordinarily best served; (2) one of the strongest presumptions of our law is that a mother has a prima facie right to her children over any other person; (3) a mother should not be deprived of the custody of her child of tender years because she is compelled to work for a living; and (4), a lapse from moral standards is not a controlling factor where the parent is not otherwise at fault and where the lapse does not involve the treatment and care of the children.
 

 This record permits of no other conclusion than that appellant has not forfeited her right to Carolyn Sue. She was deprived of her custody by the misleading and untruthful pleas and statements of her husband; to learn her whereabouts she made every reasonable effort, through the hiring of a detective, consulting public officials, and hiring lawyers in order to secure help from the courts; and she went to the limit of having the father jailed for contempt of court in order to secure her return. There is no justification for finding that she had knowledge of the child’s whereabouts simply because she knew her husband’s father to be George Shaw. It is clear that in 1962 when she learned that George Shaw had the child, she and her counsel extended every effort, without success, to have
 
 *345
 
 George Shaw return the child to the jurisdiction of the California court which had imprisoned its father. Failing in this, she made the trip to McKeesport, Pennsylvania, to recover the child herself and was willing to stay in McKeesport for as long as reasonably necessary to win the affections of the child before taking it back to Texas with her.
 

 Furthermore, there is nothing in her own conduct which causes us to find that she has forfeited her rights except the fact that she had a second child on January 12, 1960, which was not long after she and her husband had lived together with his mother in Escondido, California, and before she was divorced from Arthur. The lower court found that following the discontinuance of the divorce action in that state, in the latter part of 1959, her husband departed with the child. We do not consider the fact of this second birth an important factor in this case. Furthermore, it does not involve the treatment and care of appellant’s children.
 

 It is true that after her husband left her and her second child was born she had difficulty in maintaining herself and child without any help from her husband. He has paid nothing on several orders of court directing him to pay. Nevertheless, she has succeeded in securing several jobs, from the earnings of which, with the assistance of her friends, relatives, and a neighborhood minister, she has been able to establish a home for herself and child, a five-room apartment above a garage with a play area in the rear thereof. Except for an admitted intention to marry one of those friends, a Mr. Davis, who is presently married but separated from his wife, there is nothing in the record to justify a conclusion that their relationship involved immorality. Although appellant left her second child with friends while she made the trip to Mc-Keesport, the record shows that her concern for that
 
 *346
 
 child was a compelling reason for her to return to Texas as soon as possible.
 

 Viewing the situation from the side of the Shaws, we cannot say that the distress in this case is not due partly to their actions. Admittedly, they have cared well for Carolyn Sue since they received her from her father when she was ten to eleven months old. They have come to love her as their own. However, except for writing one letter to a lawyer who was supposed to- represent the child’s mother, they made no other effort to find the appellant. On the other hand, they did take steps to secure an injunction to prevent the child’s grandmother, or anyone else from taking the child from Pennsylvania; started proceedings to adopt Carolyn Sue; and then hired a detective to check on the appellant’s living conditions. Why could they not have made an effort to locate the mother of a ten-month old infant when they, knowing the father to be irresponsible, took custody of the child? Later he returned with another person supposed to be his wife and a child supposedly born of a previous union, thus giving further evidence of his irresponsibility.
 

 We have no doubt that appellant’s home conditions are not so favorable as those of the Shaws and that Carolyn Sue may have some difficulty adjusting to them. However, we have recognized such problems before. As between parents, the fact that the father may be able to supply to the child superior physical surroundings and advantages does not, of itself, require that the mother be deprived of the' child’s custody.
 
 Commonwealth ex rel. Logue v. Logue,
 
 supra;
 
 Commonwealth ex rel. George v. George,
 
 167 Pa. Superior Ct. 563, 76 A. 2d 459. We think the rule has greater application in the case of a mother against a grandfather and a stranger.
 

 Appellant may have difficulty working and caring for two children. She may need more help than she
 
 *347
 
 is receiving. Nevertheless, we think she is entitled to the privilege of having her child with her and of sharing her love with Carolyn Sue.
 

 Order of the lower court reversed and custody of Carolyn Sue Lovell awarded to appellant-mother, Eose J. Lovell.
 

 Ervin and Wright, JJ., would affirm. On the opinion of the court below.
 

 Rhodes, P. J., dissents.