## Commonwealth ex rel. Kuntz *v.* Stackhouse, Appellant.

Argued April 20, 1954. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ.

*James Conwell Welsh,* with him *Edwin E. Lippincott, 2nd, Hall, Hamilton, Wainwright & Welsh* and *Kraft, Lippincott & Donaldson,* for appellants.

*John Rogers Carroll,* with him *Richard T. McSorley* and *Raymond F. Stopper,* for appellee.

OPINION BY ROSS, J., September 28, 1954:

This habeas corpus proceeding for the custody of Patricia Ann Kuntz, aged two years, was instituted by her paternal grandmother, Mrs. Elizabeth Kovacs, in the Court of Common Pleas of Delaware County. The respondents, Irene and Robert J. Stackhouse, are the maternal aunt and her husband. After hearings, the court below awarded custody to relatrix, and the respondents have appealed to this Court.

The events preceding institution of this proceeding occurred in Michigan. Prior to April 10, 1953 the child's parents, Andrew and Ethel Kuntz, and the child, resided with appellee, then a widow (Mrs. Elizabeth Kuntz), on a farm owned by the latter near the summer resort town of Grand Haven, Michigan. On that date, while appellee was away on a weekend visit,

Andrew and Ethel Kuntz were brutally murdered. The child Patricia, then less than eight months old, was taken across the street to the home of the parents-in-law of her paternal uncle, Frank Kuntz, where she remained until after the funeral of her parents. Subsequently she was removed to Frank Kuntz's home. Appellants, who reside in Delaware County, went to Michigan to attend the funeral and immediately thereafter called on Judge FREDERICK T. MILES of the Probate Court of the district and expressed their desire to bring Patricia to their home in Pennsylvania and rear her as their own. They have three children of their own.

The murder had been a sensational one, and because of its atrocity had attracted front-page headlines, stories and pictures in Michigan newspapers. The Michigan Probate Court, sensing an impending controversy for custody of Patricia, declared her a ward of the court and removed her from the home of Frank Kuntz to a foster home in order to afford the interested parties sufficient time to recuperate from the shock of the terrible tragedy. On July 6, 1953 the Michigan court ordered custody awarded to appellants and they brought her to live with them in their home in Delaware County, where she is presently residing. Appellee appealed, and the Circuit Court of Ottawa County, Michigan, on October 21, 1953, vacated the decree on the basis of noncompliance with Michigan procedural law. Institution of the present proceeding in Pennsylvania followed.

The pertinent statute (Act of July 11, 1917, P. L. 817, sec. 1, 12 PS sec. 1874) requires us on appeal to exercise our independent judgment and award custody based on our own examination of the record. *Leonard v. Leonard,* 173 Pa. Superior Ct. 424, 98 A. 2d 638; *Com. ex rel. Heston v. Heston,* 173 Pa. Superior Ct. 260, 98 A. 2d 477. The paramount consideration in

cases of this nature is at all times the welfare of the child, which includes its physical, intellectual, moral and spiritual well-being, and all other considerations are subordinate. *Com. ex rel. Edinger v. Edinger,* 374 Pa. 586, 98 A. 2d 172; *Com. ex rel. Haller v. Hanna,* 168 Pa. Superior Ct. 217, 77 A. 2d 750 (affirmed, 367 Pa. 592, 81 A. 2d 546). Accordingly we have scrutinized the record to determine in the home of which of these contesting relatives the interests of this little girl will better be served.

From our examination of the record we agree with the finding of the learned president judge who tried the case that both appellee and appellants are fit persons to have custody, and that both are qualified in a material way to furnish proper facilities for bringing up the child. Both appear sincerely interested in giving her a good home, attended with loving care. Both parties own their own homes, located in residential areas. Appellee, after the tragedy, sold her farm and moved into a home in Grand Haven, Michigan, which is comfortable and contains ample space to accommodate Patricia. In June 1953 appellee married Louis Kovacs, who testified that he is desirous of having Patricia live with them. Appellee has an income from the estate of her deceased husband and Kovacs is employed at a weekly salary of $75. Appellants reside in a newly developed area of Newtown Square, Delaware County. Appellant husband, a carpenter by trade, built the modern-type home in his spare time. He is now engaged in the contracting business of building with an annual income ranging from $6,000 to $7,500. Although the new home is amply spacious to accommodate the child, should the need arise he would be in position to add extra rooms. Character witnesses appeared for both parties at the hearings to attest to their good reputations and standing in their respective

communities. Neither party has questioned the moral fitness of the other to have custody.

The learned trial judge, having found moral fitness and material advantages of both homes in equilibrium, based his decision on religion and relationship. While correctly recognizing that no statute requires that a child's custody be given to one of the same religious creed as that in which the parents baptized the child, he nevertheless found the requirement of the Adoption Law applicable by analogy, and awarded custody to the grandmother on the basis of such analogy. We think this was error.

Appellee and appellants are of different religious persuasions. Both produced their respective pastors as witnesses to attest to their activity and interest in church affairs. Appellee is an active church worker and appellants, while not as regular in their own church attendance as prior to the time when they had three children to care for, have nonetheless seen to it that their children receive religious training and at the time of the hearings their eldest child had a perfect attendance record there.

We have no concern with committing the child to any particular creed or denomination. Our sole concern is that the home to which we assign it shall provide proper spiritual and material benefits and blessings.

Quite recently (July 13, 1954) we have had occasion to review this problem in *Com. ex rel. Donie v. Ferree*, 175 Pa. Superior Ct. 586, 106 A. 2d 681. In fairness to the learned court below, the *Donie* case had not been decided when its decree in the present case was made. In the *Donie* case the writ issued at the instance of the paternal grandmother and was directed against foster parents in whose home the mother had placed the child and who had been caring for it for

approximately three years. The parties were of different religious faiths. The lower court awarded custody to the grandmother, which we reversed on appeal. Speaking through Judge Wright, we stated at pages 590-591: "This [meaning religion] is not a determining factor: Commonwealth ex rel. Kelley v. Kelley, 83 Pa. Superior Ct. 17. Religion is an important matter and should be given consideration, but it does not determine the right to custody: Oelberman Adoption Case, 167 Pa. Superior Ct. 407, 74 A. 2d 790. As was said by President Judge Rhodes in that case, 'Unquestionably, the child will be given religious training by respondents, and its home will not be devoid of a religious atmosphere.' And see Commonwealth ex rel. Burke v. Birch, 169 Pa. Superior Ct. 537, 83 A. 2d 426."

The lower court found that the grandmother was closer in kinship than the aunt, and construing the law to require award of custody in accordance with closeness of relationship, ruled in favor of appellee. As authority it cited *Com. ex rel. Stevens v. Shannon*, 107 Pa. Superior Ct. 557, 164 A. 352. This is no longer the law. Because of its similarity to the present case in this respect, we again refer to *Com. ex rel. Donie v. Ferree*, supra, 175 Pa. Superior Ct. 586, 106 A. 2d 681, in which opinion we stated at pages 589-590: "The language relied upon by the lower court was influenced by the Act of June 13, 1836, P. L. 539, which provided that, if a child's parents were deceased, the grandparents were responsible for its support. (Repealed by the Act of June 24, 1937, P. L. 2017, but supplied in pertinent part by the Support Law of 1937, P. L. 2045). In Rumsey's Case, 135 Pa. Superior Ct. 515, 7 A. 2d 43, both of the child's parents were deceased, and we awarded custody to the stepfather as against grandparents. Judge Hirt said, 'If the minor were destitute the law would cast upon the grandparents the duty of his

maintenance and the correlative right to custody would follow the duty to maintain: Commonwealth ex rel. Stevens v. Shannon, 107 Pa. Superior Ct. 557, 164 A. 352. But the child is being maintained without charge upon his estate and the grandparents are not seeking custody because of any duty imposed upon them by law . . . To remove the child from a home, with all of its advantages, in which he has lived for years, and from the wholesome environment to which he has made a complete adjustment, could not be done in the interests of the child.' In Commonwealth ex rel. Barnett v. Currie, 165 Pa. Superior Ct. 477, 69 A. 2d 154, decided after the responsibility of grandparents for support had been eliminated, (Act of May 23, 1945, P. L. 864, 62 PS 1973), the child's parents were both deceased. The lower court awarded custody to the stepmother as against the maternal grandmother. In affirming, we distinguished the Shannon case, and rejected appellant's contention that she had an inherent common law right as natural guardian which was superior to that of a mere stranger." It is clear, therefore, that appellee's status as grandmother per se, under existing law, confers no inherent right to custody of her grandchild.

Appellants are approximately 30 years of age. Appellee and her husband are in their early-to-middle fifties. While many cases could be cited in which the courts have favored the more youthful of the claimants to custody, we, of course, do not believe that the age of appellee, standing by itself, disqualifies her as a proper custodian of her grandchild, although it is a factor to be considered.

As the situation presently exists, Patricia is being brought up with three young cousins, ranging in age from one to seven years. Mrs. Lillian Davis, a caseworker for Delaware County Institution District, ap-

peared as a witness to confirm her impressions of appellants' home as they pertain to custody, which were incorporated in her report of December 24, 1953. This was in accordance with the rule of *Com. ex rel. Oncay v. Oncay,* 153 Pa. Superior Ct. 569, 34 A. 2d 839, cited in *Com. ex rel. Balick v. Balick,* 172 Pa. Superior Ct. 196, 92 A. 2d 703, that in contested child custody cases reports of investigators cannot be received in evidence but the investigators themselves must be produced and examined as witnesses and be subject to cross-examination, just as all other witnesses. Mrs. Davis testified that at the instruction of Judge MILES she had made five visits to appellants' home. Her report, stipulated by counsel for the parties as admissible after cross-examination, describes appellants as a "normal, young, middle-class family with wholesome attitudes toward their children" and that they "seem to have accepted Patricia as their own, and she, in turn has responded favorably to the affection she has obviously received. She appears to be a healthy, well cared for child, as do the other children in the home". Mrs. Davis further stated that appellants' home has "ample play and living area" and ". . . the Stackhouse family is wholesome and the atmosphere of their home conducive to the best welfare of the child".

We mentioned above the sensationalism of the murder of the parents. No stigma attached thereby either to them, who were the innocent victims of a bestial killer, or a fortiori to the child who was deprived of her parents. Fortunately because of her infancy, Patricia will have no memory of the terrible incident. However, others in the locality will remember. It is the common experience of mankind that however kind, solicitous and sympathetic the attitude of one's neighbors may be, if it serves to remind one of a horrible tragedy in family background, it is to be avoided if at

all possible. Here Patricia, if she grows up in Pennsylvania, will be hundreds of miles away from the scene of the crime. The possibility of ever-present reminder will be remote. We think it is better, therefore, to have her remain and grow up here, accepted as a member of a good family, with cousins of her own age, than to return to the immediate vicinity of the tragedy and be known as the surviving child of murdered parents, as we fear would happen if her custody were awarded to appellee.

In arriving at our decision we have not been insensitive to the emotional ties which bind appellee to the grandchild who lived for eight months in her home and which ties must of necessity because of distance be severed except for occasional visits. It seems quite natural that the grandmother should want the child to continue living with her. Appellee, who lost her son and daughter-in-law, and appellant wife, who was the only sister of the murdered woman and who came to Michigan to administer to her needs at the time of Patricia's birth, have both suffered immeasurable loss through the fault of no one except that of an insane killer. Decisions in cases such as this are difficult but they must be made, and it is our opinion that the welfare of this little girl will best be served by allowing her to remain with appellants.

Decree reversed and the record is remitted to the court below with direction to enter a decree awarding the custody of Patricia Ann Kuntz to the respondents, Robert J. and Irene Stackhouse.